**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF MISSISSIPPI**
**SOUTHERN DIVISION**

**SENICA MATTHEW FRANKLIN, #R6822**                                    **PETITIONER**

**VS.**                                                              **NO.1:10CV336-HSO-JMR**

**RONALD KING**                                                       **RESPONDENT**

## REPORT & RECOMMENDATIONS

This matter comes before the Court pursuant to Petitioner Senica Franklin's Petition [1] for Writ of Habeas Corpus and accompanying Memorandum [2] in Support filed July 27, 2010. Respondent Ronald King filed a Response [9] on September 29, 2010. This Court, having been advised in the premises and having considered the entire record, including the lodged state court record, the Petition [1] and Memorandum [2] in Support, the Response [9] and all relevant law, recommends that the Petition [1] for Writ of Habeas Corpus should be denied.

### I. STATEMENT OF THE CASE

This case concerns the deaths of Brenda Mason and Donald Brock. On October 31, 2001, at approximately 8:30 p.m. firefighters responded to a call on Texas Avenue in Gulfport, Mississippi. Arriving at the scene, officers found Mason's home fully consumed by fire. After partially subduing the fire, two rescue workers gained entry to the home and found the bodies of Brenda Mason and Donald Brock in a front room. It was later determined that both had gunshot wounds to the back of their heads and were dead before the fire had ignited. Three years later, Franklin was charged with the murders of Mason and Brock and one count of arson. Franklin's first two trials ended in mistrial; at the third he was found guilty of all counts and handed two life sentences plus twenty years for the arson charge, all to run concurrently.

At the third trial, the jury heard two days of testimony. The prosecution offered fire and medical experts, police investigators, and several witness linking Franklin to the crime. The primary medical expert was Dr. Paul McGarry, a licensed forensic pathologist who inspected the bodies at the scene and later performed the autopsies. Upon inspection of the bodies at the scene, Dr. McGarry made a determination, later confirmed in his autopsy findings, that both victims died as a result of gunshot wounds to the head. [S.C.R. vol. 9, 967]. Dr. McGarry also discovered a grazing gunshot wound on Brock's left scalp, directed from front to back. [S.C.R. vol. 9, 969]. The bullets recovered from both bodies measured nine millimeters or .38 inches, appropriate for a .380 handgun. [S.C.R. vol. 9, 969]. Dr. McGarry concluded that because he found no burning or smoke smoot staining of the tissue in the victims' mouth, nose, or windpipe, they had both died of their wounds before the fired ignited and were burned postmortem. [S.C.R. vol. 9, 970].

The prosecution's fire expert was David Dry, the Deputy State Fire Marshall.  According to Dry's report, the fire department was dispatched at 8:29 p.m. and arrived on the scene at 8:32 p.m. When Deputy Dry later arrived at the scene, he helped with general salvage and overhaul.   The following day, he and his team of investigators began their investigation. The team first took videos and pictures of the scene then created a reconstruction to determine the cause of the fire. [S.C.R. vol. 8, 868]. Immediately, Dry ruled out an accidental ignition due to gas or electricity because no utilities were connected to the dwelling at the time of the fire. [S.C.R. vol. 8, 872]. The team also eliminated lighters or candles as the cause and categorized the fire as "incendiary": set by human hands under circumstances where the person knows it should not be set. [S.C.R. vol. 8, 872] Considering both the eye-witness accounts of a fast-developing fire and burn patterns, the deputy also suspected an accelerant had been used. However, none of the samples sent off to the state crime lab tested positive for accelerants. [S.C.R. vol. 8, 875].

During cross-examination, the defense tested the deputy's theories. The deputy confirmed that they had found candles in the home and that if a candle had been present in the area determined to be the origin of the fire, or was the origin of the fire itself, it would have been totally consumed and not detectable. [S.C.R. vol. 8, 882]. The deputy also admitted that it was his best guess that the fire was incendiary; he had considered the homicide in forming that opinion, yet he had no proof that the murders and fire were either contemporaneous or related. [S.C.R, vol. 8, 883].

The prosecution also called Detective Charles Brodie, the lead detective of the crime scene unit during the investigation. Detective Brodie testified that in the fire investigation, officials discovered four spent shell casing in the front room that were determined to be .380 in caliber. [S.C.R. vol. 9, 981]. These casings were processed by the state crime lab and found not to match the chrome .380 handgun recovered from Franklin pursuant to a search warrant [S.C.R. vol. 9, 986]. Investigators were also unable to detect any blood or brain matter residue on the clothing seized pursuant to the warrant.[S.C.R. vol. 9, 989]. Ultimately, Brodie testified, the crime lab was unable to find any link between Franklin and any of the at least forty items of evidence collected during the investigation.  The bulk of the testimony linking Franklin to the crime came from five witnesses: four men who served time in the Harrison County Adult Detention Center ("HCADC") with Franklin from 2002-2003 and a witness who saw Franklin the night of the fire, Tosha Johnson. Johnson testified that she knew Franklin and saw him the night of the fire walking fast north on Texas Street, the same direction she was heading, and that he had come from the area of the house. [S.C.R. vol. 8, 839, 41].

Of the four inmates, the prosecution's strongest witnesses linking Franklin to the crime was Billy Patton, then an inmate in the federal penitentiary in Louisiana. Patton was a self-described lifelong friend of Franklin, and his roommate at the HCADC in 2002. [S.C.R. vol. 9, 903].  Patton

testified that over the several months stretch that they occupied the same cell block, Franklin confessed to the murders and arson in piecemeal fashion. [S.C.R. vol. 9, 905]. Franklin told Patton that he and Mason had been in a heated argument earlier that October day because she had owed him money. When she didn't pay, he went to her house later that night and shot the two victims with a .380, set the house on fire, and threw the gun into a septic tank on the side of the house.  [S.C.R. vol. 9, 906-07]. Patton testified that he did not initially step forward with the information; however when he learned a year later that Franklin had threatened him and his family while in the HCADC, he contacted authorities. [S.C.R. vol. 9, 908].

Another  federal inmate, Christopher Thompson, testified that on the night of the crimes he saw Franklin standing on a corner in the neighborhood looking up at the smoke in the sky. [S.C.R. vol. 9, 920]. Franklin got into his truck and as he did so, Thompson noticed a chrome .380 pistol in his waistband. [S.C.R. vol. 9, 921].  In late 2002 and January of 2003, Thompson and Franklin were housed in the same cell block of the HCADC. During this time, Franklin never confessed to the crime but when he was told that Billy Patton was thinking about going to the authorities with information, he slammed his hands down on a table and  threatened Patton and his family. [S.C.R. vol. 9, 925].

Reginald Merritts,  who had spent time with Franklin both in and out of jail, testified that on the night of the fire, around eight, he arrived home to find Franklin leaning on his neighbor's truck in his driveway. [S.C.R. vol. 9, 935]. After a length of time anywhere from ten to thirty minutes, he came back outside and gave Franklin a ride to nearby apartment complex. [S.C.R. vol. 9, 936]. Later, when he was incarcerated with Franklin at the HDAC,  Franklin asked him if he could be convicted without a murder weapon and  admitted that he had shot Mason and Brock. [S.C.R. vol. 9, 944-45].

The defense theory was simple: Franklin was innocent and the prosecution was being misled

by jailhouse snitches . First,  no physical evidence linked Franklin to the crime: the casings did not match his gun, no other gun was recovered, no residual matter from the shootings was found on any clothing taken from his home. In addition, the only testimonial evidence was weak. The only proof the prosecution had was the questionable testimony of Tosha Johnson and the four biased inmates-two who were married to a set of sisters and two who were co-defendants in a separate drug-related crime-all openly hopeful for a reduction in their sentences.

Second, according to the times given by both prosecution and defense witnesses, it was very unlikely, if not impossible, for Franklin to be perpetrator. To do so he would have had to move erratically about the neighborhood in a very short period of time without showing any signs of physical exertion to any witnesses. For an example the defense pointed to the testimony of Merritts. Merrits saw Franklin leaning against a neighbor's truck when he arrived home at eight that night. Ten to thirty minutes later, Merritts gave Franklin a ride during which they saw the burning Therefore it would have been impossible for Thompson to have seen Franklin on the corner watching the fire. The chronology of events, the defense argued,  precluded Franklin from being the shooter.

After two hours of deliberation, the jury came back with a unanimous guilty verdict on all three counts. Franklin was sentenced to two life sentences without possibility of parole on the murder convictions and twenty years for the arson conviction, all to run concurrently. Franklin appealed, and the Mississippi Court of Appeals affirmed the judgment. *Franklin v. State*, 23 So. 3d 507 (Miss. Ct. App. 2009), *cert. denied*, 22 So. 3d 1193.  Thereafter, Franklin filed an Application for Leave to Proceed in Trial Court with a motion for post-conviction relief. The Motion was denied by the Mississippi Supreme Court by Order dated May 5, 2010. "Ex. B" attached Resp. [9-2].

Franklin filed the instant Petition [1] for Writ of Habeas Corpus on July 27, 2010, raising the following  grounds of relief:

1. The trial court erred in not granting Petitioner's motion for a new trial.

2. Petitioner was denied his right to the effective assistance of counsel.

3. The trial court erred in not granting defense counsel's circumstantial evidence jury instruction.

4. Petitioner's right to confrontation was violated when the trial court sustained the state's objection as to the relevancy of the questioning of the only witness able to place petitioner in reasonable proximity to the location of the crime.

*See* Pet'n [1]; Mem. In Supp. [2].

## II. STANDARD OF REVIEW

### A.

The authority of this Court to issue habeas corpus relief for persons in custody of the state is governed by 28 U.S.C. § 2254 as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). *See Lindh v. Murphy*, 521 U.S. 320, 336 (1997) (Recognizing AEDPA amendments apply to all cases filed after its effective date of April 26, 1996.) Under its guidelines, § 2254 provides:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State Court shall not be granted with respect to any claim that was adjudicated on the merits in State Court proceedings unless that adjudication of the claim-
>
> > (1) resulted in a decision that was contrary to, or an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or
> >
> > (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State Court proceeding.

28 U.S.C. § 2254.

As a threshold matter, this Court must first determine whether the state court adjudicated Young's claims on the merits, and therefore must apply the standards of 2254(d)(1-2). Federal courts presume that a claim is adjudicated "on the merits" if it has been presented to a state court and then

denied absent an indication of reliance upon state procedural law. *Harrington v. Richter*, 131 S. Ct. 770, 784-85 (2011). An "on the merits" decision takes many forms; a state court does not need to give an opinion or a statement of reasons for the denial, nor must a state court "cite or even be aware of cases under 2254(d)." *Id.* at 784. A claim will be analyzed under the terms of § 2254(d) "whether or not the state court reveals which of the elements in a multi-part claim it found insufficient, for § 2254(d) applies when a 'claim,' not a component of one, has been adjudicated." *Id.* Consequently, a state court summary ruling is an "on the merits" adjudication for § 2254 purposes. *Id.* at 785.

The presumption of a merit-based decision can be overcome "when there is reason to think some other explanation for the state court's decision is more likely." *Id*. Respondent urges, and this Court agrees, that all of Franklin's claims were adjudicated on the merits either on direct appeal or post-conviction relief. Therefore, all claims within Franklin's petition will be considered adjudicated on the merits.

## B.

The purpose of the AEDPA amendments to 28 U.S.C. § 2254 was to minimize the role of federal habeas courts to "prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Bell*, 535 U.S. at 693 (quoting *Williams v. Taylor*, 529 U.S. 362, 386 (2000)). In a habeas court's deferential posture, relief may only be granted under the "contrary to" clause of § 2254(d)(1) with a showing that the state court's decision was contrary to then clearly established federal law. Under the "unreasonable application" clause of § 2254(d)(1), only a showing that the state court unreasonably applied the correct federal legal principle to the facts of the case will support relief. *Bell*, 535 U.S. at 693. Third, relief may be granted if the state court decision "was based on an unreasonable determination of facts in light of the record before the state court." § 2254(d)(2). These are difficult standards for a petitioner to meet; section 2254 is

understood to "guard against extreme malfunctions in the state criminal justice system." *Harrington*, 131 S. Ct. at 785. The Great Writ is to be issued only when "there is no possibility fair-minded jurists could disagree that the state court's decision conflicts with [Supreme Court] precedents." *Id.*

The focus of any inquiry under the "unreasonable application" clause of § 2254(d)(1) is determining if the state court application of clearly established federal law was objectively unreasonable. *Bell*, 535 U.S. at 693. The Court has repeatedly asserted that an unreasonable application is wholly distinct from an incorrect one. "[A] federal habeas court my not issue the writ simply because the court concludes in its independent judgment that the relevant state-court decision applied clearly established law erroneously or incorrectly. Rather, the application must also be unreasonable." *Williams*, 529 U.S. at 408. In a § 2254(d)(1) analysis, federal courts are now limited "to the record that was before the state court that adjudicated the claim on the merits." *Cullen v. Pinholster*, 131 S. Ct. 1388, 1398 (2011); *Rabe v. Thaler*, - F.3d -, 2011 WL 3311756 *3 (Aug. 3, 2011) (recognizing the limitation of a federal habeas court to the state record as held in *Pinholster*.) As a result, "a federal habeas petitioner must overcome the limitation of § 2254(d)(1) on the record that was before the state court." *Id.* at 1400.

The "contrary to" clause is similar to its § 2254(d)(1) counterpart in that the federal habeas court must weigh the state court decision against federal precedent. The analysis, however, is not focused on the application of federal law. Instead, federal courts must examine if the state court decision conflicts with clearly established federal law while also maintaining deference to state adjudications. Accordingly, the writ is to be issued only when "there is no possibility fair-minded jurists could disagree that the state court's decision conflicts with [Supreme Court] precedents." *Harrington*, 131 S. Ct. at 785.

When approaching a fact-based claim under § 2254(d)(2), a habeas court considers if the state

court decision was grounded in an "unreasonable determination of facts in light of the record before the state court." § 2254(d)(2). In its analysis, a federal habeas court presumes that the underlying state court made sound factual findings. *Woods v. Quarterman*, 493 F.3d 580, 584 (5th Cir. 2007). That presumption is only rebutted, and thus an unreasonable determination proved, when the petitioner presents clear and convincing evidence of state court error. *Id.*

## III. ANALYSIS

### A.

Franklin claims that his conviction is contrary to the overwhelming weight of evidence and thus the trial court erred in denying his motion for new trial. In imputing the evidence against him, Franklin relies on his first two trials that ended in mistrial. He argues that because no new evidence was presented during the third trial, any result incongruent with that of the first two trials must necessarily be against the overwhelming weight of evidence. As with the first two trials, the prosecution presented no physical evidence linking to Franklin to the crime in the third trial. Without the informant testimony, Franklin argues,  no jury could have found him guilty beyond a reasonable doubt. Faced with this circumstance, Franklin claims that the trial court should have "ensured the basic elements" of his right to a fundamentally fair trial and thus erred in denying his motion for new trial.

Federal habeas corpus is not designed as a "'super' state supreme court."*Dickerson v. Guste*, 932 F.2d 1142, 1145 (5th Cir. 1991)(quoting *Martin v. Wainwright*, 428 F.2d 356, 357 (5th Cir. 1970)). This Court will not evaluate state court decisions on state law questions. *Molo v. Johnson*, 207 F.3d 773, 776 n.9 (5th Cir. 2000). Inasmuch as Franklin's claims call for the review of the denial of his motion for new trial, this Court cannot grant such relief. On the other hand, federal habeas corpus does provide a remedy for injury of constitutional in magnitude.

Federal habeas review of sufficiency claims finds its genesis in *In re Winthrop*. 397 U.S. 358 (1970). There, the Supreme Court declared that the Due Process Clause of the Fourteenth Amendment protects against a criminal conviction "except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *Id*. at 364. The Court approached *Winshop's* new evidentiary standard through federal habeas almost a decade later in *Jackson v. Virginia*, 443 U.S. 316 (1979). Before *Jackson*, habeas review of the sufficiency of evidence underlying a state conviction focused primarily on proper jury instruction: if the reasonable-doubt instruction was given, only a record devoid of evidence of an essential element would be sufficient to issue the writ. *Id*. 316, 13. In *Jackson*, the Supreme Court recognized that *Winshop's* new "fundamental . . . substantive constitutional standard . . . requires more than simply a trial ritual." *Id*. at 317.  Instead, it required the finder of fact to "rationally apply that standard to the facts in evidence." *Id.*  As a result, the critical question for federal habeas courts became, and is now: does the record reasonably support a finding of guilt beyond a reasonable doubt? *Id*. at 318. Tempering that inquiry with the Court's  traditional reluctance to disturb the discretion of the jury and the habeas underpinnings of finality and comity, *Jackson* ruled that a reviewing court must determine if "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond reasonable doubt." *Id.* at 319.

A federal habeas court does not re-weigh the facts to make its own determination of guilt or innocence. *Id*. at 318-19; *see Cavazos v. Smith*, 565 U.S. ___ (2011) (per curiam)(slip op., at 6). Rather, we review an insufficiency of evidence claim in the light most favorable to the verdict, accepting all credibility choices and reasonable inferences made by the jury.  See *United States v. McCord,* 33 F.3d 1434, 1439 (5th Cir.1994); *See also United States v. Garcia*, 86 F.3d 394, 398

(5th Cir. 1996) (noting that juries are "free to choose among all reasonable constrictions of evidence"). Evidence must not "exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt." *United States v. Lage*, 183 F.3d 374, 382 (5th Cir. 1999). A court "faced with a record of facts that support conflicting inferences must presume-even if does not affirmatively appear on the record-that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution."*Jackson*, 443 U.S. at 326. This analytical framework controls whether the evidence supporting conviction is direct or circumstantial. *Lage*, 183 F.3d at 382.

Though we analyze the underlying state decision according to this standard, the Court is also bound by the "highly deferential standard for evaluating state-court rulings" imposed by AEDPA. *See Lindh v. v. Murphy*, 521 U.S. 320, 333 n.7 (1997); *Cavazos v. Smith*, 565 U.S. ___ (2011) (per curiam)(slip op., at 6). As the Supreme Court has repeatedly instructed, the focus of the analysis is not whether the trial court judge should have granted the motion or if it was an abuse of discretion for him not to do so. Rather, the proper examination for this Court is whether the determination by the Mississippi Court of Appeals that there was no error on behalf of the trial judge was "contrary to, or an unreasonable application of" the *Jackson* standard. *Renico v. Lett*, 130 S.Ct. 1855, 1862 (2010); *Cavazos*, 565 U.S. at ___ (slip op., at 1, 8 n.*).

The Court of Appeals considered the issue at considerable length, examining Franklin's claims regarding the lack of physical evidence, the inconsistent testimony of witnesses, and the reliance on inmate testimony. The Court noted that Franklin was correct that no physical evidence was presented that conclusively linked him to the crime. The handgun recovered from Franklin did not match the casing recovered form the murder scene. None of the samples taken from the murder scene by police and fire investigators were traced back to Franklin. The clothes seized by police had

no presence of blood or tissue matter. Yet despite the lack of physical evidence, the prosecution did present an abundance of testimonial evidence that linked him to the crimes, including two confessions to the murders and arson, and the jury was well within its duty to determine the evidence it would find as true and that it would find as untrue.

Franklin's arguments concerning the quality of this testimony-that it was inconsistent with prior testimony and largely attributable to "snitches"-are irrelevant. The resolution of conflicting testimony is the province of the jury, and under *Jackson* a court must presume these inconsistencies were resolved in favor of the prosecution. The only issue is whether there was sufficient evidence such that any rational trier of fact could find all elements of the crime beyond reasonable doubt; it is not the directive of this Court to weigh the evidence and re-evaluate the jury's findings. Testimonial evidence was presented that linked Franklin to the victims, presented a motive for the killings, a weapon for the killings and, most importantly, confessions to the killings and the arson. [S.C.R. vol. 9, 905, 45]

After a complete review of the record, the evidence was sufficient for any rational trier of fact to find all elements of murder and arson beyond a reasonable doubt. Thus, "there is no possibility fair-minded jurists could disagree that the state court's decision conflicts with" the *Jackson* standard. *Harrington*, 131 S. Ct. at 785. As a result, Franklin's sufficiency of evidence claim should be denied.

## B.

Franklin asserts three claims under *Strickland*: (1) counsel was inadequately prepared for trial in failing to arrange witnesses or review and prepare evidence; (2) counsel failed to ask follow-up questions on cross-examination; and (3) counsel failed to further pursue questioning of Tosha Johnson about her mental disability. Mem. [2] in Supp. 2. Though the Mississippi Court of Appeals

declined to decide Franklin's ineffective assistance of counsel claims, the claims were brought before the Mississippi Supreme Court through a petition for post-conviction relief and summarily denied. Pet'n [1] 2-3. Federal courts presume that a state court adjudicated a claim on the merits when it has been presented with a federal claim and has denied relief absent an indication of reliance upon state procedural law. *Harrington*, 131 S. Ct. at 784-85. By the terms of § 2254, a state court need not give an opinion or statement for the reasons of its denial, nor must a state court "cite or even be aware of cases under 2254(d)." *Id.* at 784.

The *Strickland* standard is a highly deferential one, and likewise is the standard of § 2254. When coupled together, the review is "doubly deferential." *Cullen*, 131 S. Ct. at 1403. It is imperative that the two standards be kept apart; the question under a *Strickland* review via § 2254 is not one of the reasonableness of counsel's actions, but rather "whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id.* The *Strickland* standard "must be applied with scrupulous care," as an ineffective assistance claim may serve as a route to avoid defaults of waiver or raise issues not brought forth at trial thereby undermining "the integrity of the very adversary process the right to counsel is meant to serve." *Harrington*, 131 S. Ct. at 788.

For relief under *Strickland*, a petitioner must satisfy two prongs: first, that counsel's performance was deficient and second, that this deficient performance prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984).  To establish a deficient performance, a petitioner must demonstrate that "counsel's representation fell below an objective standard of reasonableness." *Id*. at 688. A court reviewing a *Strickland* claim "must be highly deferential" and begin with "a 'strong presumption' that counsel's representation was within the 'wide range' of reasonable professional assistance." *Harrington*, 131 S. Ct. at 787 (quoting *Strickland*, 466 U.S. at 689). Embedded in the Sixth Amendment is a "constitutionally protected independence of

counsel and . . . the wide latitude counsel must have in making tactical decisions." *Strickland*, 466 U.S. at 689. A federal habeas court must be mindful that a general rule demands "more leeway [to] courts . . . in reaching outcomes in case-by-case determinations." *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004).

A showing of prejudice requires the petitioner to show that "counsel's errors were so serious as to deprive the defendant of a fair trial." *Strickland*, 466 U.S. at 687.The analysis focuses on whether the deficiency of counsel "undermines the confidence in the outcome" and that the "trial cannot be relied on as having produced a just result." *Id*. at 694, 686.  Absent a showing that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," the defendant's claim will fail. *Id*. at 694. A different result must not simply be conceivable, "[t]he likelihood of a different result must be substantial." *Harrington*, 131 S. Ct. at 792. Thus, as "mere conclusory allegations on a critical issue are insufficient to raise a constitutional issue," the petitioner must advance claims that are concrete and specific. *Koch v. Pucket*, 907 F.2d 524, 530 (5th Cir. 1990) (quoting *United States v. Woods*, 870 F.2d 285, 288 n.3 (5th Cir. 1989)).

Franklin first argues that counsel was ineffective because he failed to conduct a proper pre-trial investigation. In evaluating counsel's decisions, this Court must remain "highly deferential" and embrace  "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." (5th Cir. 2004). Though this standard lacks certain specificity, the *Strickland* Court gave a more contoured definition of the deference owed to counsel's judgments regarding pre-trial investigations:

> [S]trategic choices made after thorough investigation of law and facts relevant to plausible
> options are virtually unchallengeable; and strategic choices made after less than complete
> investigation are reasonable precisely to the extent that reasonable professional judgments

support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.

*Strickland*, 466 U.S. at 690-91.

Franklin offers little specificity to support his claim. Though he submits that counsel failed to interview witnesses, he does not name which witnesses, what information those witnesses may have offered, and if that information would have been beneficial to his defense. *See Day v. Quarterman*, 566 F.3d 527, 538 (2009) (setting prerequisites for an ineffective assistance claim based on uncalled witnesses) Without offering any such information, Franklin fails to rebut the strong presumption that counsel's actions, including his pre-trial investigation, were "within the wide range of reasonable professional assistance." *Soffar*, 368 F.3d at 471.

Franklin also claims that counsel failed to interview and subpoena witnesses from a list provided to him by the petitioner. In addition to the "heavy measure of deference" given to counsel's pretrial decisions, federal habeas courts traditionally disfavor claims of uncalled witnesses. *Strickland*, 466 U.S. at 690-91; *Day*, 566 F.3d at 538. Because claims based on the testimony of a possible witness are largely speculative, a petitioner is required to name the witness, demonstrate that the witness is able to testify and would have done so, detail the content of the proposed testimony, and show that the testimony would have been favorable to a particular defense. *Day*, 566 F.3d at 538. Franklin has failed to satisfy any of these requirements. His petition does not include the names of the potential witnesses, the substance of their testimony, or how that testimony would have aided his defense. Accordingly, this claim is also without merit and should be denied.

Franklin also argues that counsel was ineffective as a result of his failure to ask follow-up questions of both prosecution and defense witnesses. A claim of ineffectiveness of counsel cannot be based on a decision regarding trial tactics unless the decisions "are shown to be 'so ill chosen that it permeates the entire trial with obvious unfairness." *Teague v. Scott*, 60 F.3d 1167, 1172 (5th Cir. 1995) (quoting *Garland v. Maggio*, 717 F.2d 199, 206 (5th Cir. 1983)). Franklin has failed to populate his claim with specific instances of misconduct, however, the Court has reviewed the entire state court record and finds no deficiency in counsel's handling of witnesses.

Specifically in the questioning of key witnesses, counsel provided thorough and capable direct examination and cross-examination using many tools of the trial attorney's arsenal. In the cross-examination of Tosha Johnson, the state's sole eye witness, counsel asked follow-up questions to impugn the credibility of her memory and her testimony as a whole. First, he quizzed Ms. Johnson about the discrepancy between what she had just testified to Franklin wearing the night of the incident during direct examination and what she had told police in her statement. (S.C.R. vol. 8, 95). He then questioned her about the distance at which she identified Franklin that night; after she could not give an accurate distance, he used himself as a prop to force Ms. Johnson to adopt a distance. Johnson refused, stating "I don't know. I couldn't even – the way I explained it to you, that's the way I explained it to you, that's the way I remember, like I say." (S.C.R. vol. 8, 95-96). Lastly, counsel followed up on the activity that Halloween night in the neighborhood. Johnson admitted that there were a lot of people throughout the neighborhood that night, some without children, that were moving around "in all sorts of ways." (S.C.R. vol. 8, 845). It was also during this cross-examination that counsel elicited testimony that Johnson could not read the statement police produced on her behalf and that she was drawing disability due to mental hardship, all by asking follow-up questions. (S.C.R. vol. 8, 846).

The strategy and results were similar with regard to counsel's questioning of State Deputy Fire Marshall David Dry. As the prosecution's witness, Deputy Dry testified on direct examination that the fire was incendiary in nature, that is it was set by human hands, and aided by the use of an accelerant. (S.C.R. vol. 8, 876-77). The adequacy of counsel is illustrated in the following colloquy:

Q: And just to make sure the jury understood what you were saying here, you believed the fire started as the result of human activity?

A: Yes sir.

Q: But you did see some candles about?

A: Yes.

Q: You saw melted candles?

A: Yes.

Q: You didn't see any in the area of the futon [the area the fire began], did you?

A: Not any that I could identify.

Q: That certainly could have been because they were totally consumed?

A: Absolutely, yes.

Q: So we don't know if there were candles even sitting on the bed. . . .

...

Q: Now, based on your opinion the fire was incendiary or deliberately set, you're not wholly fixed on that. I mean, you cannot demonstrate scientifically to this court that the fire was set by somebody . . . . [B]ut what you are giving us is your best guess; is that right?

A: Where I'm at with this, as far as scientific certainty, forensically going back , analysis, picking things apart, no, sir, I can't say what caused that fire. What I can say is the sum total of the circumstances, we've got a fire that occurred in a place that had no utilities going to it. We know we had a violent act, a double homicide that occurred, and sometime during that violent act something occurred that caused that fire to happen, and that in a nutshell is what I'm basing my incendiary opinion on.

Q: Again, that's your best guess?

A: Yes, sir.

Q: Because you cannot tell this jury even that those two violent acts and the fire are connected in any way can you?

A: I can say as far as time, there is a connection to them.

Q: A time connection?

A: They occurred in the same proximity.

Q: Proximity of each other. It's true those people could have been dead, there was a candle burning that fell on the futon that initiated the fire and that's another possibility. You can't rule that out, can you?

A: Something – no sir, I can't. . . .

[S.C.R., vol. 8, 882-83]. In this excerpt, through a deliberate and thorough cross-examination, counsel was able to call into question the deputy's opinion with regard to the nature of the fire, whether any accelerants were used in the home, and, as a result, the weight with which the jury should consider the deputy's opinions.

These are only a few of the illustrative examples of defense counsel's competent questioning of witnesses, both in direct and cross examination. After a review of the record, there can be no suggestion that the decisions made by Franklin's counsel colored the trial with "obvious unfairness." *Teague*, 60 F.3d at 1172. However, assuming *arguendo* that Franklin could prove deficiency on behalf of counsel, his claim still fails *Strickland's* second prong, prejudice. Though the Court is obliged to read his complaint liberally, Franklin gives no specifics to what questions should have been asked, to whom they should have been addressed, and what new and substantial information, if any, would have resulted. Without any specific substance to his claim, Franklin's petition fails to show how counsel's alleged deficiencies inflicted the trial with obvious unfairness. *See Day*, 566 F.3d at 538. As a result, the claim based on a failure to question witnesses should be denied.

Franklin also claims that counsel erred in failing to make "essential objections in light of the relevancy of Tosha Johnson's 'mental disability.'" Mem. In Support [3] 16. Johnson's mental disability was revealed during counsel's cross-examination:

Q: . . . Ms. Johnson, I'm not trying to embarrass you or anything, but you said you were unemployed. Why is that?

A: I draw disability, mental.

Q: What do you draw disability for?

A: Mental.

[S.C.R. vol. 8, 846]. After Johnson's answer, the prosecution lodged an objection to the question's relevance and the objection was sustained. Counsel did not offer a rebuttal to the objection, an omission that Franklin now asserts rendered counsel ineffective. To prevail on this claim, Franklin must overcome the strong presumption that his counsel did not pursue the rebuttal as a result of his professional judgment. *Strickland*, 466 U.S. at 690.

At the time of the objection, counsel had already called Johnson's credibility and memory of events into serious question. He had also established that Ms. Johnson received disability payments for a mental illness. Ms. Johnson was only the second witness for the prosecution. Pressing the matter by arguing an unlikely position with the trial judge or continuing to question a lay witness about a potentially embarrassing mental disability would likely undercut counsel's position with the jury for the remainder of the trial. Franklin fails to present the Court with any new information that would have been elicited from further questioning Johnson that was worth the risk of losing the jury at such an early stage in trial.  The decision to halt cross-examination at this point was likely a part of counsel's  trial strategy and well within the 'wide range' of reasonable professional assistance." *Harrington*, 131 S. Ct. at 787 (quoting *Strickland*, 466 U.S. at 689).   Not only does Franklin fail to rebut this presumption, but he also fails to prove that the choice was an error "so serious as to deprive the defendant of a fair trial." *Strickland*, 466 U.S. at 687. As a result, the decision of the Mississippi Supreme Court was not an unreasonable application of, or contrary to, the *Strickland* standard. Thus, the claim should be denied.

Lastly, Franklin argues that counsel was ineffective due to his failure to request a jailhouse informant instruction. Four of the prosecution witnesses were in custody of law enforcement at the time of their testimony: Grady Sumrall, Billy Patton, Christopher Thompson, and Reginald Merritts. Under Mississippi law, a cautionary instruction regarding jailhouse informant testimony is not required when a benefit is not conferred to the witnesses in exchange for their favorable testimony. *See, e.g,, Moore v. State*, 787 So. 2d 1282, 1286 (Miss. 2001) (holding refusal to grant informant instruction not error if informants do not receive favorable treatment in exchange for testifying); *Moffett v. State,* 49 So. 3d 1073, 1104-05 (Miss. 2010) (finding a plea proposal was not offered in exchange for testimony therefore refusal of informant instruction was not error). Counsel cross-examined each of the four witnesses on whether any benefit had been given or if they anticipated any relief to result from their testimony. While some did admit to hoping a reduction in their sentence would result, none testified that anything had been promised by the prosecution or law enforcement. [S.C.R. vol. 9, 911, 932]. As a result, any request for a cautionary instruction would have likely been rejected. If a counsel cannot be deemed deficient for failing to raise a meritless objection, *See, e.g., Clark v. Collins*, 19 F.3d 959, 966 (5th Cir. 1994), it follows that counsel cannot be faulted for not submitting a foredoomed jury instruction.

Assuming *arguendo* that counsel was deficient for not requesting a cautionary instruction, Franklin cannot satisfy *Strickland's* second "prejudice" prong. From a review of Franklin's pleadings and the entire record, the failure to request the cautionary instruction does not "undermine[] the confidence in the outcome" so that the "trial cannot be relied on as having produced a just result." *Strickland* at 694, 686. The jury heard evidence of the four witnesses' criminal records and Franklin's counsel was permitted to fully question all four about any

preferential treatment they received or hoped to receive in return for their testimony. Counsel also requested jury instruction D-7, which was given to the jury, stating:

> The Court instructs the Jury that you have the duty to determine the believability of each witness called to testify. You should consider the witness's ability to observe and remember, their sincerity, and their demeanor while testifying. You should consider also the extent to which the witness is either supported or contradicted by other evidence; the relationship the witness may have to either side or party; whether the witness benefits from testifying; and, whether the witness may benefit by the verdict. You may consider any evidence of a witness's character for truthfulness.

[S.C.R. vol. 2, 269]. Taking these factors into consideration, and in light of the whole record, the simple request of a cautionary instruction, most likely to be rejected, was not substantially likely to change the outcome of the case. Thus, Franklin cannot meet either prong of the *Strickland* standard.

As this Court finds no part of Franklin's claim for relief based on the ineffective assistance of counsel is viable, it cannot be said that the Mississippi Supreme Court's decision was contrary to, or an unreasonable application of, clearly established federal law. Accordingly, this ground for relief should be denied.

## C.

In Ground Three, Franklin argues that the trial court's refusal to give a circumstantial evidence instruction, offered as defense instruction D-6, violated his due process rights. The instruction offered read:

> The Court instructs the jury that before you are warranted in convicting the Defendant on the evidence in this case you must exclude every reasonable hypothesis consistent with his innocence; and that if there is a reasonable hypothesis consistent with his innocence then it is your sworn duty to find the Defendant not guilty.

(S.C.R. vol. 2, 277). Initially, the trial court granted the instruction. However, after an argument by

the prosecution that direct testimony of confessions had been offered thereby rendering the instruction unwarranted, the court reversed itself and refused it. [S.C.R. vol. 10, 1069]. Franklin contends that there was no such confession, and that the inconsistency of the Patton's testimony over the course of the three trials is sufficient to prove so. Absent a confession, and without any credible evidence, Franklin argues, a circumstantial evidence instruction should have been given.

As a rule, federal habeas courts do not grant relief for jury instructions that are erroneous under state law. *Estelle v. McGuire*, 502 U.S. 62, 71-72 (1991). Nor does the due process clause "permit the federal courts to engage in a finely tuned review of the wisdom of state evidentiary rules." *Marshall v. Lonberger*, 459 U.S. 422, 439 n.6 (1983). Rather, in keeping with the purpose of the Great Writ, a federal habeas court reviews jury instruction claims for "prejudice of constitutional magnitude." *Sullivan v. Blackburn*, 804 F. 2d 885, 887 (5th Cir. 1986). Thus, the controlling question is "whether the failure to give an instruction 'by itself so infected the entire trial that the resulting conviction violates due process.'" *Galvan v. Cockrell*, 293 F. 3d 760, 764-65 (5th Cir. 2002)(quoting *Cupp v. Naughten*, 414 U.S. 141, 147 (1973). In other words, a petitioner must show prejudice: that the error "had a substantial and injurious effect or influence in determining the jury's verdict."*Brecht v. Abrahamson*, 507 U.S. 619, 637-38 (1993). A federal habeas court must examine the allegedly unconstitutional omission or rendering of an instruction "in the context of the instructions as a whole and the trial record," *Estelle*, 502 U.S. at 72, through a harmless-error analysis. *Galvan*, 293 F.3d at 765. If the trial court's instruction was accurate and lawful, no federal constitutional issue is raised. *See Galvan,* 293 F.3d at 765 (holding that a substantively correct instruction "does not offend the federal constitution.")(citing *California v. Ramos*, 463 U.S. 992, 1004-05 (1983)).

Under Mississippi law, when all evidence proving guilt is circumstantial, that is it "gives rise

to a logical inference that a fact does exist," a trial court must grant a circumstantial evidence instruction. *Kirkwood v. State*, 52 So. 3d 1184, 1186-87 (Miss. 2011)(citing *Manning v. State*, 735 So. 2d 323, 328 (Miss. 1999)).  This instruction counsels the jury that "every reasonable hypothesis other than that of guilt must be excluded in order to convict." *Id.* While the distinction between direct and circumstantial is admittedly imprecise, a confession or admission to "a significant element of an offense" falls plainly within the gamut of direct evidence against a defendant. *Id.* (citing *Mack v. State*, 481 So. 2d 793, 795 (Miss. 1985)); *Ladner v. State*, 584 So. 2d 743, 750 (Miss. 1991)("A circumstantial evidence instruction must be given only when the prosecution can produce neither an eyewitness nor a confession/statement by the defendant.") . Though admissions by a defendant to another individual (such as a fellow inmate) are not "properly" understood as confessions, such evidence is an admission. *Mack v. State*, 481 So. 2d at 795 (citing *Reed v. State*, 229 So. 2d 269 (1956)).

In *Rubenstein v. State*, Rubenstein argued that testimony by a fellow inmate about admissions Rubenstien had made to him were not direct evidence because the witness was a jailhouse informant. 941 So. 2d 735, 785 (Miss. 2006).  He argued that because the testimony was patently false, the remainder of the evidence against him was circumstantial and thus the trial court erred in not granting a circumstantial evidence instruction. *Id.* The Mississippi Supreme Court, stating "direct evidence may also consist of a confession by the defendant, including the defendant's admission to a person other than a law enforcement officer," pointed to a record replete with confessions and admissions, including those made to fellow inmates, and affirmed the trial court's decision. *Id.*

The record before the Court likewise contains admissions by Franklin to fellow inmates. Billy Patton testified that, over the course of several months, Franklin said that "he shot Brenda, shot

Ronald, and he set the house on fire." [S.C.R. vol. 9, 905]. Reginald Merritt also testified that Franklin admitted to the shooting while the two were incarcerated together. [S.C.R. vol. 9, 945]. Though Franklin disputes whether these confessions actually did occur, that determination rests solely within the province of the jury. The trial court, however, correctly recognized the testimony of both Patton and Merritt as direct evidence proving the guilt of Franklin and refused the instruction. As the trial court's ruling was consistent with state laws, and Franklin presents no prejudice suffered from the ruling, there is no error of constitutional magnitude. Accordingly, Franklin's claim in ground three should be denied.

### D.

In his fourth and final ground, Franklin claims that the trial court violated his Confrontation Clause rights by not allowing defense counsel to question Tosha Johnson about her mental disability. The state appellate court found this claim meritless. The court reasoned that because Franklin's counsel was able to elicit an admission from Johnson that she did have a mental disability, he was not deprived of the impeachment opportunity that he argues the court denied to him. *Franklin*, 23 So. 3d at 517. Franklin argues that in restricting the cross-examination to a mere admission of disability, the trial court wrongfully limited questioning of the bias and credibility of a key prosecution witness in contravention of the Sixth Amendment. Franklin contends that his counsel should have been permitted to impeach the credibility of the state's only eyewitness by testing her perceptive ability and her memory. If so allowed, Franklin continues, a reasonable jury might have formed a much different perception of Johnson and considered her testimony accordingly.

"The main and essential purpose of confrontation is to secure for the opponent the opportunity of cross-examination." *Davis v. Alaska*, 415 U.S. 308, 315-16 (1974)(quoting 5 J. WIGMORE,

EVIDENCE § 1395, 123 (3d ed. 1940)). "Cross-examination is the principle means by which the believability of a witness and the truth of his testimony are tested." *Id.* at 315.  In cases such as this one, "involving trial court restrictions on the scope of cross-examination, the [Supreme] Court has recognized that Confrontation Clause questions will arise because such restrictions may 'effectively ... emasculate the right of cross-examination itself.'" *Delaware v. Fensterer*, 474 U.S. 15, 19 (1985)(quoting *Smith v. Illinois*, 390 U.S. 129, 131 (1968)). "It does not follow, of course, that the Confrontation Clause of the Sixth Amendment, prevents a trial judge from imposing any limits on defense counsel's inquiry into the potential bias of a prosecution witness. On the contrary, trial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or marginally relevant." *Deleware v. Van Arsdall*, 475 U.S. 680, 679 (1986). "The Confrontation Clause of the Sixth Amendment is satisfied where defense counsel has been permitted to expose to the jury the facts from which jurors, as the sole triers of fact and credibility, could appropriately draw inferences relating to the reliability of the witness." *United States v. Landerman*, 109 F.3d 1053, 1061 (5th Cir.1997) (quotation marks omitted).

The law becomes more focused, and much more demanding, when the witness involved is a "key" prosecution witness. In *Greene v. Wainwright*, the Fifth Circuit reviewed the conviction of a police officer for the sale of marijuana to another officer. 634 F.2d 272, 275 (1981). As the prosecution's only eye-witness, the purchasing officer testified that Greene sold him the marijuana; Greene testified that though he did go to an apartment with the other officer, he only witnessed the officer exchange money for marijuana.  *Id.* at 273. As the court noted, "[u]ltimately, the case came down to a contest of credibility." *Id.* At 274. To bolster Greene's defense, his counsel anticipated

asking the other officer questions at trial about his problems with his mental health and stability that had been revealed in pretrial depositions. *Id.* at 273-74. However, the trial court granted the state's motion to limit testimony to only the events of the sale and the chain of custody thereafter. *Id.* at 274. The Fifth Circuit reasoned that "[w]here the witness the accused seeks to cross-examine is the 'star' government witness, providing an essential link to the prosecution's case, the importance of full cross-examination to disclose possible bias is necessarily increased." *Id.* at 275 (quoting *United States v. Summers*, 598 F.2d 450, 460 (1979)). The court then held that the "petitioner was denied the opportunity to present evidence of any sort, including by cross-examination" and that "[t]his absolute prohibition exceeds any possible trial court discretion." *Id.* at 276. Finding a violation of the Confrontation Clause had occurred, the court ordered the writ of habeas corpus to be issued. *Id.* at 276-77.

In *Hargrave v. McKee*, a man was charged with rape and car-jacking, and was ultimately convicted of carjacking. 248 Fed. Appx. 718 (6th Cir. 2007). As the trial ultimately came down to the jury's determination of credibility-whether they believed Hargrave or the victim, the defense sought to question the victim about her diagnosis as a paranoid schizophrenic and an episode near the time of the incident in which she had jumped out of a window because she believed her neighbors were trying to rape and torture her. On the first day of trial, the prosecution made an oral motion in limine to exclude all questioning regarding the victim's psychiatric history. *Id.* The trial court granted the motion and excluded all reference to her psychiatric condition except via an admission on the stand that she had been diagnosed as a paranoid schizophrenic. Defense counsel was not permitted to inquire any further. *Id.* In reviewing Hargrave's federal habeas petition, a Sixth Circuit panel held that any reasonable application of *Davis* would require the trial court to allow Hargrave the opportunity on cross-examination to develop the facts through which the jurors

could adequately determine the reliability of the state's "sole eyewitness." *Id.* at 727-28. As in *Davis*, "[o]n the basis of the limited cross-examination that was permitted [to Hargrave], the jury might well have thought that defense counsel was engaged in a speculative and baseless line of attack on the credibility of an apparently blameless witness." *Id.* (quoting *Davis*, 415 U.S. at 318).

In the instant matter two important distinctions are abundantly clear. First, and most importantly,  though Johnson may be considered an eye-witness regarding placement of Franklin near the crime scene, she was not the prosecution's "star" witness against Franklin. *Greene*, 634 F.2d at 275. Unlike in *Greene* and *Hargrave*, she did not provide the only testimony as to key elements of the crime; in fact, she presented none. The prosecution's key witnesses were Patton and Merritts who both testified that Franklin had unequivocally confessed to the crime. [S.C.R. vol. 9, 905, 45] Second, defense counsel produced no evidence before or during trial to support the claim that her mental disability was relevant to the credibility of her testimony. Mental disability relief is available for a wide range of conditions, and not all affect an individual's perception or memory.

This Court must also consider  the extent of the trial court's limitation of cross-examination in the context of *Greene* and *Hargrave*. Unlike the court in *Greene*,  the trial judge allowed Franklin's defense counsel to elicit an admission from Johnson that she had a mental disability. Yet as the court in *Hargrave* points out, a simple admission still raises serious Confrontation Clause issues. However, the significance of Johnson as a witness and, more importantly, Franklin's confessions to the two inmates still remain.

Considering all the evidence presented in this case pursuant to AEDPA's deferential standard, the state appellate courts' affirmation of the decision to limit the questioning of Johnson regarding her mental disability is not contrary to, or an unreasonable application of, clearly established federal law and the claim should be denied. Further, assuming *arguendo* that the limitation of cross-

examination did violate Franklin's Confrontation Clause rights, this Court finds that any error would be harmless.

Confrontation Clause violations are subject to a harmless error analysis. *See Van Arsdall*, 475 U.S. at 681-82. On collateral review, federal habeas relief may only be granted for a Confrontation Clause violation if it "had substantial and injurious effect or influence in determining the jury's verdict." *See Fry v. Pliler,* 551 U.S. 112, 121-22 (adopting the *Brecht* standard for § 2254 proceedings); *Brecht v. Abrahamson*, 507 U.S. 619, 637(1993) (quotation and citation omitted). When a state court does not perform its own harmless-error review, a federal habeas court will still apply the *Brecht* harmless-error analysis. *Robertson v. Cain*, 324 F.3d 297, 306 (5th Cir.2003). In reviewing for harmless error, the Court considers a number of factors "includ[ing] the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case." *Van Arsdall*, 475 U.S. at 684.

Defense counsel was allowed to conduct a thorough cross-examination that resulted in raising serious doubts as to the credibility of Johnson. In fact, after a review of the record, the credibility of Johnson, and her importance to the prosecution's case, was significantly mitigated during her direct examination. Johnson could not identify the name of any street where she alleged to have seen Franklin throughout her testimony and differed in her account of whether Franklin was running or walking. [S.C.R. vol. 8, 90, 92]. Moreover, Johnson testified that she saw Franklin running or walking in a direction away from the scene, but never testified she saw him coming from the house: "I just seen [sic] him running from that way, but I didn't know what house or nothing. I just seen him coming from that way." [S.C.R. vol 8, 90]. She also testified that Franklin made some utterance to

her, though her memory of the utterance ranged from "because I am running. You better go," to, after she was read her police statement, something "like, 'it's [sic] two peoples in that house." [S.C.R. vol 8, 90, 92]. On cross-examination, Johnson faired worse. She claimed that Franklin was not walking or running, but "walking fast" and she failed to give an estimate of how far away she was from Franklin when she identified him despite defense counsel's attempt at an in-court demonstration. [S.C.R. vol 8,95, 96].

Most importantly, however, is the testimony of Patton and Merritts. Billy Patton testified that over the course of several months, Franklin said that "he shot Brenda, shot Ronald, and he set the house on fire." [S.C.R. vol. 9, 905]. Another inmate, Reginald Merritt, also testified that Franklin admitted to the shooting while the two were incarcerated together: "he had said that he shot her." [S.C.R. vol. 9, 46].  These two confession offered corroborating evidence to the material point of Johnson's testimony and thereby greatly strengthened the case against Franklin. Considered in combination  with the slight benefit that Johnson's testimony actually offered and the fact that defense counsel did get an admission to the jury of her mental disability, the Court finds that the trial judge's ruling did not have a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht*, 507 U.S. at 637. As such, the ruling of the state appellate court cannot be deemed as contrary to, or an unreasonable application of, clearly established federal law. This ground for relief should be denied.

## RECOMMENDATION

Based on the foregoing analysis, the Petitioner has failed to show that the underlying state court decisions are contrary to, or an unreasonable application of, clearly established federal law. Therefore, this Court recommends that the Petition [1] for Writ of Habeas Corpus be denied..

In accordance with the Rules of this Court, any party, within ten days after being served a copy of this recommendation, may serve and file written objections to the recommendations, with a copy to the District Judge, the U.S. Magistrate Judge, and the opposing party.  The District Judge at that time may accept, reject or modify in whole or in part, the recommendation of the Magistrate Judge, or may receive further evidence or recommit the matter to this Court with instructions.  Failure to timely file written objections to proposed findings, conclusions, and recommendations contained in this report will bar an aggrieved party, except on the grounds of plain error, from attacking on appeal unobjected to proposed factual findings and legal conclusions accepted by the District Court. *Douglass v. United States Auto Ass'n*, 79 F.3d 1425 (5th Cir. 1996).

This the ___31st___ day of January, 2012.

_____s/ John M. Roper, Sr._____
CHIEF UNITED STATES MAGISTRATE JUDGE